```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3    UNITED STATES OF AMERICA,          )
                                         )
 4                     Plaintiff         )
                                         )   No. 1:22-cr-10026-RWZ-3
 5    vs.                                )
                                         )
 6    JOHN YOUNIS,                       )
                                         )
 7                     Defendant.        )
                                         )
 8                                       )
                                         )
 9

10

11              BEFORE THE HONORABLE RYA W. ZOBEL
                  UNITED STATES DISTRICT JUDGE
12                         SENTENCING

13

14

15

         John Joseph Moakley United States Courthouse
16                     Courtroom No. 12
                       One Courthouse Way
17              Boston, Massachusetts 02210

18

                          June 29, 2022
19                          2:02 p.m.

20

21

                  Kristin M. Kelley, RPR, CRR
22                   Official Court Reporter
         John Joseph Moakley United States Courthouse
23              One Courthouse Way, Room 3209
                  Boston, Massachusetts 02210
24               E-mail: kmob929@gmail.com

25       Mechanical Steno - Computer-Aided Transcript
```

APPEARANCES:


     David M. Holcomb

     United States Attorney's Office MA

     1 Courthouse Way

     Suite 9200

     Boston, MA 02210

     617-756-9043

     David.Holcomb@usdoj.gov

     for Plaintiff.



     Jennifer L. Chunias

     Dylan Schweers

     Goodwin Procter, LLP

     100 Northern Avenue

     Boston, MA 02210

     617-570-8239

     Jchunias@goodwinprocter.com

     for Defendant.

```
 1                    P R O C E E D I N G S
 2                THE CLERK:  All rise.
 3                (The Honorable Court entered.)
 4                Please be seated.
 5                THE CLERK:  This is the United States versus John
 6       Younis.  It's Criminal No. 22-10026.
 7                Can I ask counsel please to identify themselves for
 8       the record.
 9                MR. HOLCOMB:  Good afternoon, your Honor.  David
10       Holcomb for the United States.
11                THE COURT:  Hold on one second.  The government
12       doesn't appear until page 3 of the document.
13                MR. HOLCOMB:  What a shame.
14                MS. CHUNIAS:  Good afternoon, your Honor.  Jennifer
15       Chunias on behalf of Mr. Younis.
16                THE COURT:  Sorry?
17                MS. CHUNIAS:  Jennifer Chunias, from Goodwin Procter,
18       and Dylan Schweers, Goodwin Procter, on behalf of defendant
19       John Younis.
20                THE COURT:  Does the government wish to be heard?
21       They had an objection to paragraph 66.
22                MR. HOLCOMB:  The government doesn't need to be heard.
23                THE COURT:  My inclination is to overrule it because I
24       don't think it's necessary.
25                MR. HOLCOMB:  I agree.  Thank you, your Honor.
```

The timestamps in the left margin: line 10 "02:02", line 20 "02:03".

         1          THE COURT:  I think that also deals with one of the

         2   defendant's objections.  Do you wish to be heard as to any of

         3   them?

         4          MS. CHUNIAS:  No, your Honor.

         5          THE COURT:  I thought that Probation did such a good

         6   job that I was going to overrule all of them.

         7          MS. CHUNIAS:  That's fine.  Thank you, your Honor.

         8          THE COURT:  I think that's okay.

         9          MS. CHUNIAS:  That's appropriate.

02:04   10          THE COURT:  All right.  So what we end up then is with

        11   an ultimate conclusion that the guideline provisions call for a

        12   12 to 18 months prison sentence, supervised release of two to

        13   five years, and then a fine of $5,500, up to five million

        14   dollars, no restitution, I'm not exactly sure I understand

        15   that, and a Special Assessment of $200, which is mandatory.

        16          I wish to talk about the fine now because I'm not sure

        17   what has happened from either brief or the Probation report,

        18   which also relies on the briefs.  Has there been a fine and has

        19   it been paid or have the parties agreed that there is a fine

02:05   20   payable that has been paid?

        21          MR. HOLCOMB:  Your Honor, the government has filed a

        22   motion --

        23          THE COURT:  Can you please sit down and speak into the

        24   microphone.  Thank you.

        25          MR. HOLCOMB:  Your Honor, the government has filed a

motion for order of forfeiture which would account for the

profits that Mr. Younis personally gained --

THE COURT:  Is the microphone on, Lisa?

THE CLERK:  Yes, they are.

MR. HOLCOMB:  Can you hear me better now?

THE COURT:  Yes.

MR. HOLCOMB:  The government has filed a motion for an

order of forfeiture, which would account for Mr. Younis's

profits, personal profits, from the insider trading scheme.

02:06  The government would not recommend a fine.  As your Honor may

be aware, there's a parallel SEC case that is being resolved.

So I believe the parties have discussed, and our recommendation

would be for the remaining fines to be handled in that parallel

case.  As far as a money order, it's the government's motion

for an order of forfeiture that would be relevant to today.

THE COURT:  So there was an agreed amount of $51,725

that was to be paid, correct?

MR. HOLCOMB:  Under the plea agreement, correct.  Yes,

your Honor.

02:06  THE COURT:  That amount has not yet been paid,

correct?

MR. HOLCOMB:  Correct.

THE COURT:  It has been paid?

MR. HOLCOMB:  It has not been.

THE COURT:  Has not been.  I think that the plea

1   agreement called for forfeiture.

2          MR. HOLCOMB: That's correct, your Honor.

3          THE COURT: What?

4          MR. HOLCOMB: That's correct.

5          THE COURT: Do you want this on the judgment as well?

6          MR. HOLCOMB: I would request that, yes.

7          THE COURT: So what you're looking for is a payment of

8   the 51,000 plus dollars as forfeiture.

9          MR. HOLCOMB: Correct, your Honor.

02:07 10          THE COURT: In addition to that, you're looking for a

11   fine.

12          MR. HOLCOMB: No, your Honor. I would recommend that

13   the fine be addressed in the parallel case.

14          THE COURT: It's the government's request for

15   financial punishment, if you will, and that's the extent of it?

16          MR. HOLCOMB: Correct.

17          THE COURT: What's the defendant's position?

18          MS. CHUNIAS: Our position is consistent with that.

19          THE COURT: You can sit too.

02:07 20          MS. CHUNIAS: Which is consistent of paragraph 6 of

21   the plea agreement. That's our understanding. Mr. Younis is

22   prepared to pay the forfeiture amount immediately. What our

23   understanding is, the government's pending motion would need to

24   be entered and then he'll pay the forfeiture amount here.

25          As the government said, there's a parallel SEC matter

that Mr. Younis also has entered into a consent order there.

We anticipate a financial component there once this Court

enters its judgment.

    THE COURT:  So the long and the short of it is the

parties agree that he is to pay an amount of 51,000 plus

dollars as forfeiture.

    MS. CHUNIAS:  Correct, your Honor.

    MR. HOLCOMB:  Yes, your Honor.

    THE COURT:  And no other payment?

    MS. CHUNIAS:  That's correct.

    MR. HOLCOMB:  Correct.

    THE COURT:  That took a lot of paper to get there.

    Mr. Mills, are you with me still?

    PROBATION:  Yes, your Honor.  We were discussing this

at some length this morning because neither of us understood

what the parties' positions were.

    MS. CHUNIAS:  We certainly could have done a better

job then.  My apologies.

    THE COURT:  I will hear the government's

recommendation.

    MR. HOLCOMB:  Thank you, your Honor.

    In terms of the sentence, what the government is

recommending is a split sentence of --

    THE COURT:  You will need to keep your voice up.

    MR. HOLCOMB:  I'll try my best.  The government is

recommending a split sentence of six months incarceration and six months home detention, which is a sentence that would satisfy --

THE COURT:  The first one was six months of what?

MR. HOLCOMB:  Incarceration.

THE COURT:  Incarceration.

MR. HOLCOMB:  Correct.

THE COURT:  Six months jail.  And then six months home detention?

02:09 MR. HOLCOMB:  That's correct, your Honor.  I'm going to try this microphone and see if it's any better.  How's that?

THE COURT:  It works.

MR. HOLCOMB:  Your Honor, in addition to that sentence, as noted, we would move for that order of restitution and recommend 24 months of supervised release following the sentence.

THE COURT:  In addition to the six months, what other punishment is there?

MR. HOLCOMB:  24 months supervised release.

02:10 THE COURT:  Sorry?

MR. HOLCOMB:  24 months of supervised release.

Your Honor, may I proceed?

THE COURT:  This is not exactly what you asked for in your brief.

MR. HOLCOMB:  I apologize.  Your Honor.  That is

correct. Under the plea agreement, we agreed on recommendation

by the government, I believe, 24 months of supervised release

rather than 36 months. I apologize. The reason we're asking

for incarceration and home detention is because the

government's chief concern in this case is the sentence be

adequate to deter others from engaging in the type of insider

trading that Mr. Younis engaged in which, for today's purposes,

I'll call friends and family insider trading.

The facts of this case are relatively simple. They're

an example of a common story, of friends and family illegally

trading off of information acquired from companies that they

work for.

Mr. Younis was lifelong friends with David Forte and

Gregory Manning. They grew up together in Needham. They went

on vacations together as adults. David Forte had a relative

who worked for a public company. When David Forte learned from

his relative that the company planned to acquire another public

company, called Linear, David Forte tipped Mr. Younis and

Gregory Manning to buy Linear Securities.

Mr. Younis, who at the time had only $500 in his

brokerage account and hadn't traded all year, put approximately

$60,000 into his brokerage account after speaking with Forte

and bought Linear call options and stock. Almost $5,000 of

that investment went to options that would have been valueless

had Linear's share price not increased before the options

1    expired.  Approximately $53,000 was invested in stock just a

2    couple of days later.

3         Only days after that Linear's share price leapt upon

4    the news that Analog, the company that Forte's relative worked

5    for, was acquiring Linear.  Mr. Younis sold all of his Linear

6    call options and stock the next day for a profit of $52,000

7    approximately, which is almost double his initial investment,

8    in a single securities issuer over the course of less than a

9    week.

02:13 10         As I mentioned, the government's chief concern is

11   general deterrence.  I don't have specific reason to believe

12   that Mr. Younis will fall into additional stock tips or be

13   presented with many additional opportunities to trade public

14   securities based on inside information.

15        I do think it's notable though that not only did

16   Mr. Younis not hesitate to trade on the inside information that

17   he got from David Forte, he also used this information in

18   another way.  He tipped a business associate to buy Linear

19   stock.  This was someone who gave Mr. Younis's company

02:14 20   business.  Mr. Younis had valuable information about Linear.

21   He tipped his customer to buy Linear and Mr. Younis's customer

22   made a quick $11,000 profit based on the tip too.

23        I think this goes to the more important concern that

24   the government has in this kind of a case.  It is common for

25   friends and relatives to pass inside information between each

other and to trade on it, but it is very difficult to police

this activity.  Why is it so hard to police stock tipping

between family members and friends?  In the financial industry,

trading by financial professionals is strictly regulated and

policed.  It's understood that these people come into inside

information every day and it's understood that there is a risk

that they may trade on material nonpublic information.  In the

case of family and friends, many people who worked for public

companies can obtain information.  That information can be

shared and traded on by their family and friends.  There are no

such reliable tools for policing this activity.

For example, one of FINRA, the Financial Industry

Regulatory Authority, one of FINRA's tools is to contact public

companies involved in deals, identify the employees who knew

about the deals and have those employees review a list of names

to see if they recognized any of the names of individuals who

traded around the deal.  In this case, David Forte's close

relative, the one who worked at Analog, the acquiring company,

reviewed such a list.  The list had Mr. Younis and

Mr. Manning's names on it, but David Forte's relative did not

identify those names as individuals that he knew.

Friends and families' insider trading is worthy of

deterrence.  Our Sentencing Memo cites some of the literature

that underscores how public security markets rely on fairness,

transparency and the idea that, when you buy and sell

securities, you're not buying and selling securities from
someone who unfairly knows more about the company than you do
because they've received leaked information about the company
that you don't have.

That kind of information that David Forte gave his
friends and that Mr. Younis traded on is cheating.  It's
securities fraud.  It not only cheats the people on the other
side of the trades, but it also undermines the markets that
rely on fairness and trust.

02:17   Because of the prevalence of this type of insider
trading and the difficulty in policing it, the government today
asks the Court to consider a sentence that is part home
detention but also part incarcerative.  That is consistent with
the guidelines that are especially crafter for deterring
insider trading.  For Mr. Younis, this would be a 12 month
sentence, six incarceration, six home detention.

I want to briefly address two additional points.
Mr. Younis's Sentencing Memo highlights that he is the longtime
owner of a successful business that employs others and needs to
02:17   be operated whether Mr. Younis is in prison or not.  Mr. Younis
is to be applauded for that success, but I would suggest that
given the relatively short sentence that the government is
recommending already, the concerns that are voiced about the
viability of the company's operations, depending on what kind
of sentence is imposed, I would respectfully suggest that

they're overstated and that this is especially true in light
of, apparently, Mr. Younis's son's now long-term involvement in
the business.

Relatedly, I would respectfully add that Mr. Younis
should be credited for his business success and impact on his
family and community, which are highlighted in the impressive
array of letters that were submitted on his behalf, but he
should not be treated more favorably at sentencing because he
enjoys these advantages in his life, especially when they point
to an obvious fact. Mr. Younis did not need to cheat other
investors or to cheat the markets to make a quick buck. He
chose to do this. His offense is not a technical violation.

For these reasons, the government submits that a
sentence of 12 months is appropriate and no greater than
necessary in light of the sentencing objectives. Because
Mr. Younis has promptly accepted responsibility for his
conduct, the government recommends that half of the term be
satisfied by home detention. The government submits that this
is both a reasonable sentence for this particular defendant and
one that can help deter others from engaging in similar conduct
in the future.

Thank you, your Honor.

THE COURT: Thank you. How do you pronounce your last
name?

MS. CHUNIAS: Chunias.

1        THE COURT:  You may proceed, Ms. Chunias.

2        MS. CHUNIAS:  As reflected in our Sentencing Memo,

3    Mr. Younis is requesting one month of home detention and then

4    whatever special and mandatory conditions the Court deems

5    appropriate.  As we said, we did not oppose the government's --

6        THE COURT:  Do you recommend any underlying supervised

7    release period or is the one month it?

8        MS. CHUNIAS:  The one month is it.

9        THE COURT:  No supervised release beyond that?

02:19 10        MS. CHUNIAS:  As the Court deems appropriate.  We

11    understand that it's up to the Court's discretion to fashion

12    what it deems appropriate depending on what the ultimate

13    sentence is the Court decides to impose.  We didn't extrapolate

14    out what the special conditions should be depending on what

15    primary sentence the Court decides on.

16        THE COURT:  Okay.

17        MS. CHUNIAS:  Just as a little bit of context, and I

18    know that you've reviewed our papers, but Mr. Younis is a

19    59-year-old husband, father, small business owner and employer.

02:20 20    He made a grave mistake here for which he was eager to promptly

21    accept responsibility.  He's joined here today by his family

22    members:  His wife Cathy, his children, Christopher, CJ,

23    Matthew, Julie, and a close family friend Carlan.  They've come

24    in from their various scattered points to be here to support

25    him.  He has no prior criminal history.  He fully accepted

1    responsibility.

2              Just as some context, within one month after he was

3    indicted, Mr. Younis sought out and retained Goodwin Procter.

4    I assume it was not because we were the most cost effective

5    attorneys, but this is the most serious thing that has happened

6    to him and his family.  He doesn't have prior experience with

7    the criminal justice system, but he knew that he wanted counsel

8    that were going to explore with the government a promptly and

9    appropriate plea agreement so he could accept responsibility,

02:21 10    do the right thing, plead guilty, and receive his punishment.

11              As the Court is aware, Mr. Younis's co-defendants, who

12    the government pointed out were his longtime best friends,

13    they've taken a different path.  They may proceed to trial.

14    That's not a path -- which is great, but that's not the path

15    Mr. Younis wanted to pursue.  So he instructed us to, as

16    promptly as possible, negotiate a plea agreement and an

17    appropriate resolution with the government, which is what he's

18    done here.

19              As the government alluded to, he simultaneously

02:22 20    entered into a consent order with the SEC because the conduct

21    that is at issue here, it also underlies a pending SEC matter.

22    We've heard both today and in the government's Sentencing Memo

23    about the offense conduct.  We don't dispute any of that.

24    Mr. Younis pled guilty.  He knows that the conduct that formed

25    the basis for his guilty plea was wrong and should be punished.

1    He wanted to do that very promptly.  He doesn't want to prolong

2    it.

3          Likewise, the personal gain that was attributed to the

4    offense conduct here was approximately $52,000.  That was

5    Mr. Younis's personal gain.  In pleading guilty to the

6    government's loss calculation of $98,000, Mr. Younis, likewise,

7    agreed that $98,000 represents all of the proceeds that are

8    even arguably traced to him.  We don't dispute any of that.

9    Mr. Younis understands that insider trading comes in all shapes

02:23 10   and sizes and wants to accept full responsibility for that.

11          THE COURT:  So your suggestion is a total of $51,000

12   as a fine or as a forfeiture or what?

13          MS. CHUNIAS:  As forfeiture, consistent with the

14   government's pending motion, yes.

15          Separately, we expect -- Mr. Younis has entered into a

16   consent order with the SEC in conjunction, but the SEC is

17   withholding the remedy portion of that until after the Court

18   enters its order.  We expect that there will be a penalty and

19   disgorgement in that matter as well for this man of modest

02:23 20   means.

21          What we don't agree with the government, and it's not

22   going to surprise you, is the government seems to ignore

23   Section 3553(a)'s mandate that the sentence that is imposed

24   here on this individual is sufficient, but not greater than

25   necessary, to comply with the purposes of sentencing.  The

1  government also seems to ignore that this isolated action in

2  this case, while wrong and something that should be punished,

3  constituted truly abhorrent behavior for this otherwise

4  law-abiding citizen, particularly for someone in Mr. Younis's

5  modest socioeconomic position in life.  Being prosecuted or

6  being indicted and then convicted alone is a very severe

7  punishment that he will face for the rest of his life, being a

8  convicted felon as a result of this.  That's in and of itself.

9      Finally, what we don't agree with is the government

02:24 10  seems to ignore that the now advisory guidelines are the

11  starting place.  They're not the finishing place.  I mean, the

12  Supreme Court, as everyone well knows, has been very clear that

13  sentencing courts should not presume that a sentencing within

14  the guidelines will necessarily comply with the statutory

15  purposes of sentencing.  So it's not just not mandatory.  They

16  shouldn't even presume to be reasonable.  We'd suggest they're

17  just not reasonable in the case of this individual defendant

18  here.  That's particularly the case, and that individualized

19  assessment seems particularly appropriate, in the context of

02:25 20  insider trading cases where the law itself and what we

21  understand to constitute insider trading has been developed

22  over time by federal district judges interpreting a statute.

23      Also, as further context with regard to insider

24  trading, it's important to remember that there's some

25  references to white collar crime and Mr. Younis's, quote

unquote, privilege.  He's not a well-connected executive who
had every advantage.  He's not somebody who took advantage of
every day citizens.  Mr. Younis is an every day citizen.  He
is, by definition, blue collar.  He has worked at the same
family construction company that was founded by his father and
where he started working at in high school.  He now is the
majority owner of that company and is training his son to
follow in his footsteps and eventually take over the business,
but he's not a corporate executive, a hedge fund analyst, or
even a day trader who manipulated his fiduciary obligations.

As the government points out in its memo, but for the
trades that constituted the underlying conduct here, Mr. Younis
was a, quote unquote, infrequent investor.  He was a novice.
He made an enormous mistake.  He's here.  He pled guilty.  He
wants to take responsibility for that.

To now argue, as we believe the government is, that
because this offense was by every stretch and by every account,
including the numerous individuals who wrote thoughtful letters
in support of his sentencing, it was abhorrent behavior for
him.  And because he's had a modest loving upbringing and
family, built a small family business, that he should somehow
be punished more harshly than others because he was, quote
unquote, privileged is frankly inaccurate, and it's
inconsistent with the goals of sentencing.

Mr. Younis understands insider trading comes in all

shapes and sizes and he accepts responsibility for his, but the government has gone after the little guy here. He's the guy who's out on a construction site every day with his team. He's the one who is working six days a week when it's seasonally appropriate. He's working with his son. He has his wife who's working one day a week handling the office work. That is the company. It is Mr. Younis, his wife, and his son CJ.

He's not a well-connected businessman who can afford Goodwin Procter, or any law firm for that matter, but this matter was so serious and was so significant that he somehow got to us and he wanted to make sure he treated it with the utmost importance, that he had a law firm he could work with to accept responsibility, but this entire experience and his conviction have already had tremendous emotional, reputational, punitive, and deterrent impact on him individually and his family that he'll live with for the rest of his life.

The government, in its memo, even points out Mr. Younis is a nonprofessional, that he wasn't a corporate insider, wasn't the immediate tipper of the material nonpublic information. As the government notes -- and I said, but for the phrase that formed the basis for this case, he was an infrequent investor. That's the government's own words.

So against this backdrop and particularly in light of the need to avoid unwanted sentencing disparities, the government's recommended sentence just far, far exceeds what's

1  sufficient and consistent with the goals of sentencing.

2      On that point with regard to the sentencing

3  disparities, in the memo the government submitted and today, we

4  don't see that the government is pointing to another case where

5  an individual defendant with the nature and circumstances of

6  their offense was comparable to Mr. Younis and where a

7  sentencing court has imposed as severe a sentence as what the

8  government is seeking here.  We'd submit that's because there

9  aren't any.

02:29 10      In our memo, we conducted a survey too.  In our memo

11  at page 19 and 20, I think it is, we set out comparable cases

12  that we could find, and there's not many.  We understand, as

13  the government said, there is limited prosecution of these kind

14  of cases, but the sentences that are set forth there, none of

15  them are comparable to the severe guideline sentence the

16  government is seeking here in this case.  As the government

17  acknowledges in its memo, there are a limited number of trading

18  prosecutions in this friends and family insider trading under

19  circumstances comparable to Mr. Younis's.  That's because, for

02:30 20  one reason or another, they're just not brought.

21      So in such circumstances where the vast majority of

22  comparable cases by similarly situated individuals are not even

23  resulting in prosecutions at all, the fact that Mr. Younis is

24  being convicted and will live with that for the rest of his

25  life, that in and of itself is severe punishment.  That is the

general deterrence.  And not only this but, as we've talked about, this man of relatively modest means will pay a substantial forfeiture amount in this case and he will presumably pay a separate penalty and disgorgement in the SEC matter.  So against this backdrop, what we have recommended is an additional term of home detention because that is more than sufficient in addition to those already punishments to provide just punishment for his offense.

I hear the government's arguments, which seem to be there isn't enough of insider trading prosecution in cases like Mr. Younis's.  That shouldn't warrant that Mr. Younis be treated as the example by imposing any harsher a sentence than is possible.  It's just unjust with the goals of sentencing and the purposes which, among other things, entrust sentencing courts to make sure there's not wild sentencing disparities.  If the government believes there's not enough people being prosecuted for offense conduct under these circumstances, have at it.

The appropriate answer is to not make an appropriate outlier of Mr. Younis and an example of him as a general deterrent.  In his individual circumstances and for this type of offense conduct, which he fully accepts responsibility for, the conviction alone is a severe punishment, the financial penalties, and we would submit that the goals of sentencing can be achieved with an additional period of home confinement.

That's particularly the case given his personal circumstances.

In our Sentencing Memo, we tried to describe some of that for the Court. There were a number of thoughtful letters submitted by people who have known Mr. Younis for decades. It is also particularly the case in light of the dire situation in which Mr. Younis's family business would be left in if he is sentenced to any term of incarceration. As was reflected in letters, this isn't a hypothetical. This isn't something the lawyers come up with. It's a very real possibility that Priggen Steel will not survive if he's not able to be there somehow involved day-to-day.

I can tell you a little bit more about that, but Priggen Steel is a family run, third generation business. As I said, he's been working there since about 1980. It was founded by his father. He's now the majority owner. His son is a part owner. He's teaching his son the business. They are, what I have been taught to understand, a design build firm. So his son CJ does the computers, and he does the drafting and the pricing. It's Mr. Younis who runs all of the projects day-to-day.

This is largely seasonal work. They have ten employees. Those employees have been with them for 30, 25 and 15 years respectively. These are all laborers. They do siding. They do steel. But the company has only two managerial level employees. That's Mr. Younis and his son CJ.

1    So while they've considered over time hiring somebody else,

2    they simply can't afford it.  It's not financially feasible.

3    It's between Mr. Younis, Mrs. Younis and CJ that they run this

4    business.

5          Because of the nature of it, they are booked a couple

6    months ahead with jobs but they're still looking for others.

7    Right now, for instance, Mr. Younis has jobs running in Rhode

8    Island, Massachusetts and Connecticut.  Often six days a week

9    he's on those sites.  That will be running through the end of

02:34 10   the year.  While they're doing those jobs, they also need to be

11   bidding for the next ones.  That's the nature of their work.

12   It doesn't provide an opportunity for him to be absent for any

13   period or for them to just bring on other business managers and

14   salaries that they may or may not be able to afford more than a

15   few months out.

16          As CJ explained in his submission to the Court, as

17   he's learning the business now, he can't run it day-to-day.  He

18   does the design work.  He does the pricing work.  It's -- he

19   just doesn't have the knowledge and know-how that his father

02:35 20   does because he's running three or four projects at any time.

21   He's on those sites every day.  If he's not on those sites, he

22   and CJ are on the phone 15 times a day so that his father can

23   tell him, this employee needs to do this, this subcontractor

24   needs to do that.

25          Without Mr. Younis, all of that work comes to a halt.

1  Jobs will be cancelled.  And those ten employees would be,

2  presumably, out of work.  The company has very low overhead.

3  They don't do advertising, marketing.  It's all by word of

4  mouth.  It's all by reputation, including, among their

5  employees.

6          So you may have noticed that one of the letters that

7  was submitted in support of Mr. Younis was noting that during

8  the pandemic in March of 2020, when many businesses were

9  shutting down, Mr. and Mrs. Younis made the difficult decision

02:36 10  to keep paying those 10 employees, although they are a small

11  business, in hopes that those employees could continue

12  providing for their families, and when jobs started to come

13  back online, they could come back to work.  It would certainly

14  seem unjust -- it's more than unjust.  It would certainly seem

15  tragic if this small family run business that somehow managed

16  to weather COVID gets shut down now because Mr. Younis gets

17  sentenced to any term of incarceration.  That just seems

18  completely inconsistent with the directive of Section 3553(a).

19          THE COURT:  It's shut down now?

02:36 20          MS. CHUNIAS:  Sorry?

21          THE COURT:  You said the business is shut down now?

22          MS. CHUNIAS:  If it is.  I apologize.  It doesn't

23  appear necessary when there is an alternative, when this Court

24  could impose Mr. Younis to an alternative to traditional

25  imprisonment.  If he was sentenced to home detention, that

1  would allow him to continue to be involved day-to-day in his

2  business and keep it afloat.

3          Finally, I would be remiss if I didn't mention COVID,

4  having had recent experience myself.  We are still in the midst

5  of COVID.  I think it's undeniable that any term of

6  incarceration is more punitive in this current COVID

7  environment than it was before.  For the past few years, the

8  Court well knows we've seen time and time again that courts

9  have found that the threat of COVID presented a compelling

02:37 10  enough reason to release defendants who had far more serious

11  offense conduct and far more lengthy criminal histories than

12  Mr. Younis.  In light of that, it simply makes no sense and

13  would be unjust under the circumstances for a few months here,

14  as the government pointed out, where there's a home detention

15  alternative that would fully fulfill the same purpose and

16  goals.

17          THE COURT:  Thank you.

18          Mr. Younis, do you wish to say anything before I

19  impose sentence?

02:38 20          THE DEFENDANT:  Yes, your Honor.

21          THE COURT:  Go right ahead.  Just speak right into the

22  microphone.

23          THE DEFENDANT:  Six years ago I showed very poor

24  judgment.  I was wrong.  Being in this has been extremely

25  difficult on my family, my business and my community.

1      THE COURT:  Please don't whisper.

2      THE DEFENDANT:  I please ask the Court for leniency in

3  my case.  Thank you.

4      THE COURT:  Take your time.  Are you done?  You can

5  continue if you want to.

6      THE DEFENDANT:  No.  I just want to keep it short.

7      THE COURT:  Okay.

8      THE DEFENDANT:  It's been very difficult.

9      THE COURT:  Thank you.

02:39 10      There are a bunch of considerations in this case.  One

11  is that the financial markets necessarily depend on straight

12  trading based on public information, and the defendant knew

13  that the information he relied on was private information, and

14  he used it to get a very good return, what turned out to be a

15  very good deal.

16      As the government points out, insider trading is

17  particularly difficult to monitor and to detect, so precautions

18  like this are particularly important to maintain the validity

19  of this particular kind of market.

02:39 20      However, on the other side, I am totally persuaded

21  that Mr. Younis is most remorseful and I think highly unlikely

22  to repeat.  I have read the five letters from friends, family,

23  his son, and I think only one of them, the last one, is an

24  employee, all of which talk about his high standards, his

25  generosity and his kindness, and his efficiency in running the

1  office and the effectiveness of running the office.

2      Keeping in mind these opposing issues, I do not

3  believe that a sentence of imprisonment makes much sense in

4  this case.  I sentence you to a term of Probation for two

5  years, starting on September 5, because the first 30 days are

6  to be in home detention.  You will need to work out with

7  Probation the precise times of that and how that will work.

8  Mr. Mills will explain to you what that means and how it works.

9  It will be the first 30 days starting on July 5.

02:41 10      The reason I'm doing that is to allow your work to

11  continue because it's clear that your enterprise is small and

12  depends heavily on what you do for it, and other people are

13  relying on that.  The only bases for getting out of this home

14  confinement during this period is to go to work.  Again, with

15  Probation, you will work out the time for that and how that

16  will be managed and, if necessary, any medical appointments.

17  Do you go to church regularly?

18      THE DEFENDANT:  No, your Honor.

19      THE COURT:  So I don't need to worry about church.  So

02:42 20  it's medical and work that you may leave the house for but not

21  other things.  I will not ask for ankle bracelet.

22      PROBATION:  You indicated you want to start on July 5.

23  Being that Mr. Younis resides in Rhode Island, I will have to

24  contact the Probation Office there.

25      THE COURT:  Do you need an ankle bracelet?

1    PROBATION:  It's more efficient, otherwise he'll be on

2    curfew and that will require an officer calling him throughout

3    the night to see if he's home or not.  We'd ask location

4    monitoring, ankle bracelet.  Then they can enter his schedule

5    for the monitor for his work schedule and any doctor

6    appointments.

7    THE COURT:  Well, if Probation needs that for the

8    first 30 days, they'll talk to you about this and supply it and

9    that will be it, but only for 30 days.

02:43 10    There will be a money issue here.  I must confess.

11   I'm somewhat confused by both the plea agreement and various

12   efforts talking about the money involvement in this case.  I

13   believe that the parties agreed to forfeiture of $51,725.  That

14   will be part of the judgment, number one.

15   In addition to that, I think since that represents, in

16   essence, the amount of money he got back having bought the

17   stock, it cost him nothing effectively except the profit that

18   he made.  So it is appropriate being a money offense to impose

19   an additional fine.  That is $40,000.  That will be called a

02:44 20   fine in the judgment and is payable forthwith unless you need

21   time, which I should know about, so that can be recorded in the

22   Judgment as well.

23   In addition to that, you shall pay a special

24   assessment of $200.  That is $100 on each count, which is

25   mandatory under the statute, and I have nothing to say about

1  that.

2        When we are done, you shall report to your Probation

3  Officer.  Mr. Mills will take care of that.  I will not advise

4  you you have a right to appeal because you have given up your

5  right to appeal in the plea agreement yourself.  So this is no

6  plea agreement.  This is it.

7        Is there anything I have left out?

8        MR. HOLCOMB:  No, your Honor.

9        MS. CHUNIAS:  No, your Honor.

02:44 10        THE COURT:  Mr. Mills?

11        PROBATION:  No, your Honor.

12        THE COURT:  This is easier than I thought it would be.

13  Mr. Younis, you shall report to your Probation Officer, who

14  will also set up with you a table for payment of the $40,000,

15  as well as the forfeiture of $51,000, plus the $725.

16        Miss Urso already knows this will be part of the

17  Judgment.  She knows exactly how to put it, fit it into the

18  form.

19        Is there anything else?

02:45 20        MR. HOLCOMB:  Thank you.  No, your Honor.

21        MS. CHUNIAS:  No, your Honor.

22        THE COURT:  Thank you all very much.  I certainly do

23  wish you well.  Court is in recess.

24        (Adjourned, 2:46 p.m.)

25

1                  C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8           I, Kristin M. Kelley, certify that the foregoing is a

9    correct transcript from the record of proceedings taken

10   June 29, 2022 in the above-entitled matter to the best of my

11   skill and ability.

12

13

14       /s/ Kristin M. Kelley              October 26, 2022

15       Kristin M. Kelley, RPR, CRR              Date
         Official Court Reporter
16

17

18

19

20

21

22

23

24

25